# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YAKINI DEANDRE BYRD,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>R. T. C. GROUND,<br><br>　　　　Respondent. | Case No.: 1:13-cv-00569 LJO GSA HC<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a judgment of the Superior Court of California, County of Fresno, following his conviction by jury trial on May 2, 2011, of first degree murder with a firearm use enhancement. Petitioner was sentenced to serve an indeterminate term of fifty years to life.

Petitioner timely filed a notice of appeal. On November 20, 2012, the California Court of Appeal, Fifth Appellate District ("Fifth DCA"), affirmed the judgment. Petitioner then filed a petition for review in the California Supreme Court. On January 23, 2013, the petition was summarily denied.

On April 19, 2013, Petitioner filed the instant federal habeas petition in this Court. He claims

the state court erred in finding his Miranda[1] waiver was voluntary, and that his statement to police was not coerced. On August 8, 2013, Respondent filed an answer to the petition. Petitioner did not file a traverse.

## STATEMENT OF FACTS[2]

On April 19, 2009, a shooting took place on Eunice Street and Officer David Unruh responded. Another officer on the scene was attending to the victim, Robinlene Upshaw, so Unruh started interviewing witnesses. Upshaw's niece, Monet Miller, was interviewed by Unruh.

Miller told Unruh that she was standing by her aunt's car, talking with her aunt. She saw the suspect walk up from behind the car carrying a short-barreled rifle. Miller claimed she had never seen the suspect before.

Detective Mark Yee also interviewed Miller the day of the shooting at police headquarters. Miller told Yee she was standing about three feet away from Upshaw when the shooting took place. The shooter was holding the rifle with both hands and was only a foot or two from Upshaw's car when he fired the rifle. Another witness, Richard Leavy, ran away; the shooter pointed the rifle at Leavy, then walked away.

Miller said someone told her the shooter's name; she recognized the name; and the shooter was related to Leavy. Miller described the shooter as a thin, Black male with short hair, about 19 years old. Leavy was Upshaw's boyfriend.

Yee showed Miller a collection of photographs, including Byrd's, after cautioning her that the shooter's photo may not be in the group. Miller selected Byrd's photo as the person who shot Upshaw. Miller initialed the photo.

On the day of the shooting, Leavy told Officer Donald Dinnell that he heard a loud pop; heard Miller exclaim that Upshaw had been shot; and saw his second cousin, Byrd, run away. Several months later, Leavy told Detective Garcia he did not want to be a "snitch" and did not want to testify because he was afraid he would be killed.

Dinnell transported Willie Heager to police headquarters on the day of the shooting. While being transported, Heager told Dinnell that the shooter was Byrd and provided information about where Byrd might be found. Heager told Dinnell he saw Byrd shoot Upshaw.

Detective Yee conducted a recorded interview of Willie Heager on the day of the shooting. The interview was played at trial. Heager told Yee he saw Byrd approach Upshaw and Miller and fire the rifle. Then Byrd ran away.

Yee and Detective Ray Villalvazo interviewed Byrd; the recorded interview was played for the jury and also transcribed. Yee advised Byrd of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and explained those rights to Byrd. Byrd

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

[2] The Fifth DCA's summary of the facts in its November 20, 2012, opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the Fifth DCA.

told the detectives he heard people were telling on him; Byrd claimed they were lying.

Byrd initially stated someone had put him up to it because he was young; then he stated he didn't remember what happened. Byrd stated the reason for the shooting was drugs. Byrd vacillated between making admissions and denying culpability. Near the end of the interview, Byrd stated:

"I did it to that bitch because she was doing the wrong things just like that nigga was doing the wrong thing nigga. And I don't give a fuck about what nobody think. I mean, that's just how I feel, you got me[?]"

(LD[3] 4.)

**DISCUSSION**

I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Fresno County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.   Standard of Review

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[3] "LD" refers to the documents lodged by Respondent with the answer.

3

1    28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624
2    (2011); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 413.
3            As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal
4    law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71 (quoting 28
5    U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this Court must look
6    to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the
7    relevant state-court decision."  Williams, 592 U.S. at 412.  "In other words, 'clearly established Federal
8    law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at
9    the time the state court renders its decision."  Id.  In addition, the Supreme Court decision must
10   "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a
11   new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is
12   no clearly established Federal law for purposes of review under AEDPA.  Moses v. Payne, 555 F.3d
13   742, 754 (9th Cir.2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v.
14   Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006).  If no clearly established
15   Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision.
16   Carey, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.
17           If the Court determines there is governing clearly established Federal law, the Court must then
18   consider whether the state court's decision was "contrary to, or involved an unreasonable application
19   of," [the] clearly established Federal law."  Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)).
20   "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a
21   conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court
22   decides a case differently than [the] Court has on a set of materially indistinguishable facts."
23   Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at 72.  "The word 'contrary' is commonly
24   understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'"
25   Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)).  "A
26   state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the
27   state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases."  Id.  If
28   the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision

1  is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th
2  Cir.2008) (en banc).

3  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the
4  state court identifies the correct governing legal principle from [the] Court's decisions but
5  unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.
6  "[A] federal court may not issue the writ simply because the court concludes in its independent
7  judgment that the relevant state court decision applied clearly established federal law erroneously or
8  incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538
9  U.S. at 75-76. The writ may issue only "where there is no possibility fairminded jurists could disagree
10 that the state court's decision conflicts with [the Supreme Court's] precedents." Harrington, 131 S.Ct.
11 at 784. In other words, so long as fairminded jurists could disagree on the correctness of the state
12 courts decision, the decision cannot be considered unreasonable. Id. If the Court determines that the
13 state court decision is objectively unreasonable, and the error is not structural, habeas relief is
14 nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v.
15 Abrahamson, 507 U.S. 619, 637 (1993).

16 Petitioner has the burden of establishing that the decision of the state court is contrary to or
17 involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94
18 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth
19 Circuit precedent remains relevant persuasive authority in determining whether a state court decision
20 is objectively unreasonable. See LaJoie v. Thompson, 217 F.3d 663, 669 (9th Cir.2000); Duhaime v.
21 Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

22 AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1) is
23 limited to the record that was before the state court that adjudicated the claim on the merits," and
24 "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v. Pinholster, __
25 U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011). "Factual determinations by state courts are presumed
26 correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340
27 (2003) (citing 28 U.S.C. § 2254(e)(1)). However, a state court factual finding is not entitled to
28 deference if the relevant state court record is unavailable for the federal court to review. Townsend v.

Sain, 372 U.S. 293, 319 (1963), *overruled by*, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

III.     Review of Claims

Petitioner claims he did not knowingly and voluntarily waive his Miranda rights and that the statement he provided to police investigators was coerced and involuntary.

This claim was presented on direct appeal to the Fifth DCA. The claim was denied in a reasoned decision. He then presented the claim to the California Supreme Court in a petition for review. The California Supreme Court summarily denied the petition. Federal courts review the last reasoned state court opinion. Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991). Therefore, the Court must review the opinion of the Fifth DCA.

In rejecting Petitioner's claim, the Fifth DCA stated as follows:

> Byrd's sole contention on appeal is that the trial court erred prejudicially in admitting his statement. He contends his mental condition made him incapable of waiving his *Miranda* rights; the police used deceptive tactics; and his statements were the product of coercion. The record discloses Byrd's contention is without merit.
>
> *Factual Summary*
>
> We set forth the relevant facts, which we take from the hearing on the suppression motion, in the light most favorable to the trial court's ruling on the motion. (See *People v. Miranda* (1993) 17 Cal.App.4th 917, 922 ["In reviewing the denial of a motion to suppress evidence, we view the record in the light most favorable to the trial court's ruling and defer to its findings of historical fact, whether express or implied, if they are supported by substantial evidence"].)
>
> Byrd filed a motion to suppress his statement, asserting the statement was the product of coercion and that he did not knowingly and intelligently waive his rights. The trial court conducted an Evidence Code section 402 hearing on the motion over the course of several days.
>
> Byrd was under arrest when he was interviewed; the interview commenced around 10:00 p.m. Byrd was on felony probation when he was arrested. Yee and Villalvazo were dressed in civilian clothes and were not wearing their firearms during the interview. At the start of the interview, Byrd indicated he was a high school junior and "a decent student." When asked if he could understand the detectives, Byrd responded, "Yeah, real good." Yee did not notice any symptoms of Byrd being under the influence of any substance.
>
> Yee proceeded to read the card informing Byrd of his *Miranda* rights and to ask if Byrd understood each of those rights. Byrd shook his head, but did not answer audibly. Yee interpreted the head shaking to mean that Byrd was indicating he did not understand, although Yee did not believe Byrd had any difficulty in understanding his rights. However, Yee attempted to clarify what he had read to Byrd and showed Byrd the *Miranda* advisement card. After reading the card and after Yee explained a few portions of the advisement again, Byrd indicated he understood.

In opposition to the motion to suppress, four police officers testified about four prior occasions when Byrd had been arrested, advised of his rights, and indicated he understood those rights.

Doctor Avak Albert Howsepian, a staff psychiatrist with the Veterans Administration, was asked by the defense to evaluate Byrd. Howsepian interviewed Byrd twice and opined that Byrd was suffering from a psychotic disorder on the day he was interrogated. Howsepian indicated Byrd's psychotic disorder was evidenced by his contradictory and nonsensical answers and vague references. Also, Howsepian indicated that some of Byrd's answers seemed to indicate Byrd was hallucinating.

Howsepian opined that a person with Byrd's level of psychosis would be incapable of understanding his *Miranda* rights. He also opined that a normal 16–year–old boy would be unable to understand the advisements.

Howsepian was retained initially to determine Byrd's sanity for an insanity defense. Howsepian disagreed with assessments by three other doctors that Byrd suffered from a conduct disorder and that he exaggerated his hallucinations. Howsepian acknowledged that, at the beginning of the police interview, there was no indication Byrd was delusional; however, Howsepian felt the comment "people are saying I did it" indicated paranoid thinking by Byrd. Howsepian also acknowledged that Byrd had denied hearing voices or acting abnormally at the time he was interviewed by police.

The trial court cited *People v. Lessie* (2010) 47 Cal.4th 1152 and noted that the court had reviewed the transcript of the police interview, listened to the taped interview, and considered all the testimony given on the suppression motion. The trial court found no evidence that Byrd had been intimidated or spoke to officers only because he was submitting to their authority. The trial court also found that any mental health issues Byrd had did not render him incapable of understanding *Miranda* advisements, noting that Byrd was capable of insuring statements made to Howsepian would not be used against him.

In a totality of the circumstances analysis, the trial court noted that Byrd had been offered water or soft drinks by the detectives; had been advised of his *Miranda* rights at least five times in a two-year period; had acknowledged that he understood he did not have to talk with anyone and that he could ask for a lawyer at any time. The trial court found Byrd had knowingly and intelligently waived his rights and concluded by denying the suppression motion.

*Standard of Review*

"A suspect, having been advised of his *Miranda* rights, may waive them 'provided the waiver is made voluntarily, knowingly and intelligently.' [Citation.]" (*In re Norman H.* (1976) 64 Cal.App.3d 997, 1001.) The prosecution bears the burden of establishing by a preponderance of the evidence that the relinquishment of rights was voluntary and that the suspect's waiver was made with full awareness of those rights and the consequences of the waiver. The validity of a *Miranda* waiver is a factual matter to be decided by the trial judge based on the totality of the circumstances, including both the characteristics of the accused and the details of the interrogation. (*People v. Whitson* (1998) 17 Cal.4th 229, 246–247.)

Relevant factors include the details of the interrogation, the minor's age, mental and physical condition at the time of the questioning, education, intelligence, experience and familiarity with the police. (*People v. Lara* (1967) 67 Cal.2d 365, 376–377.) On appeal, the reviewing court accepts the trial court's resolution of disputed facts

and its credibility evaluations if they are supported by substantial evidence. (*People v. Cortes* (1999) 71 Cal.App.4th 62, 70.) This court, however, independently determines whether, from the undisputed facts and those facts properly found by the trial court, the challenged statements were illegally obtained. (*People v. Whitson*, supra, 17 Cal.4th at p. 248.)

*Analysis*

Our task is to determine whether the statement was voluntary, based on the totality of the circumstances, not on any one particular fact. (See *People v. Williams* (1997) 16 Cal.4th 635, 660–661; see also *Arizona v. Fulminante* (1991) 499 U.S. 279, 285–286.) We will address, and reject, each point Byrd raises as part of the totality of the circumstances showing that statements were not voluntary.

First, Byrd maintains the lack of voluntariness is demonstrated by the fact the detectives failed to advise him of his right under Welfare and Institutions Code section 627 to phone his parents and an attorney. Granted, the evidence does not reflect that this was done. This statutory factor, however, is not sufficient to find that a statement is involuntary. (*People v. Maestas* (1987) 194 Cal.App.3d 1499, 1508 [holding police are not under a duty to advise a minor of his right to talk with his parents before interrogating the minor]; see also *People v. Lara*, supra, 67 Cal.2d at p. 383 [holding minor capable of making voluntary confession without the presence or consent of counsel or other adult].)

Second, Byrd claims the detectives used deceptive practices to coerce him to confess, but the only allegedly deceptive practice he identifies is being told by police that "Nothing's going to help you but the truth" and that police would help him if he told the truth. Assuming for the sake of argument that the detectives' comments could be viewed as deceptive, police deception "does not necessarily invalidate an incriminating statement." (*People v. Maury* (2003) 30 Cal.4th 342, 411.)

"Police trickery that occurs in the process of a criminal interrogation does not, by itself, render a confession involuntary and violate the state or federal due process clause. [Citation.] Why? Because subterfuge is not necessarily coercive in nature. [Citation.] And unless the police engage in conduct which coerces a suspect into confessing, no finding of involuntariness can be made. [Citations.] [¶] So long as a police officer's misrepresentations or omissions are not of a kind likely to produce a false confession, confessions prompted by deception are admissible in evidence. [Citations.] Police officers are thus at liberty to utilize deceptive stratagems to trick a guilty person into confessing. The cases from California and federal courts validating such tactics are legion. [Citations.]" (*People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280–1281, italics added.)

The detectives' remarks were not designed to elicit a false confession; the detectives' remarks were designed to elicit the truth. Admonitions to tell the truth do not amount to coercion and statements that one is better off telling the truth do not amount to improper promises of leniency. (*People v. Seaton* (1983) 146 Cal.App.3d 67, 74.)

Third, Byrd contends the totality of the circumstances show he was coerced into making a statement: his youth, his mental state, and the deceptive comments from the detectives. The questioning of Byrd took at most 49 minutes; from 10:01 p.m. to 10:50 p.m. The record discloses that the time of the questioning was not unusually late and the length of the questioning was not unusually long. Byrd was offered refreshments during that time.

> Although Byrd's youth is a factor, his age did not preclude him from understanding and being capable of waiving his rights. (*In re Charles P.* (1982) 134 Cal.App.3d 768, 772; *In re Brian W.* (1981) 125 Cal.App.3d 590, 603.) In addition, Byrd's lengthy involvement with the criminal system, including four arrests prior to his arrest for Upshaw's murder, would indicate that Byrd's waiver was knowing and voluntary. (*People v. Lewis* (2001) 26 Cal.4th 334, 384.)
>
> As for Byrd's mental status, several experts disagreed with Howsepian's conclusions. The trial court, in its role as a fact finder, was capable of deciding which competing experts are the more convincing. (See generally *People v. Seaton* (2001) 26 Cal.4th 598, 648 ["the jury is capable of deciding which of the competing experts is the more convincing...."].)
>
> The comments from the detectives urging Byrd to tell the truth and that police would help him if he told the truth, as discussed above, do not constitute coercion. (*People v. Seaton*, supra, 146 Cal.App.3d at p. 74.)
>
> The case of *People v. Lessie*, supra, 47 Cal.4th 1152, cited by the trial court, is instructive. In *Lessie*, a 16–year–old who had completed the 10th grade, was tried as an adult and found guilty of second degree murder. (Id. at pp. 1157, 1169.) The defendant in *Lessie* had been arrested twice before his arrest for murder. (*Id*. at p. 1169.) After being arrested for murder, the 16–year–old waived his rights and agreed to speak with the police; but at one point asked to call his father. (*Ibid*.) Police continued questioning the youth, rather than allowing him to call his father, which was a violation of section 627 of the Welfare and Institutions Code. (*People v. Lessie*, supra, at pp. 1169–1170.) In reviewing the totality of the circumstances, the California Supreme Court concluded the youth had knowingly and voluntarily waived his Fifth Amendment privilege under the federal Constitution. (*Id*. at p. 1170.)
>
> *Conclusion*
>
> Upon independent review of the totality of the circumstances, we agree with the trial court that Byrd's statement to the detectives was voluntary. (*People v. Massie* (1998) 19 Cal.4th 550, 576.) Having reached this conclusion, we need not address Byrd's prejudice argument.

(LD 4.)

In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." As to the procedural safeguards to be employed, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. Nevertheless, "'[t]he defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and intelligently.'" Moran v. Burbine, 475 U.S. 412, 421 (1986) (quoting Miranda, 384 U.S. at 444, 475).

1  There are two parts to the inquiry. <u>Edwards v. Arizona</u>, 451 U.S. 477, 482 (1981). "First, the
2  relinquishment of the right must have been voluntary in the sense that it was the product of a free and
3  deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been
4  made with a full awareness of both the nature of the right being abandoned and the consequences of
5  the decision to abandon it." <u>Moran</u>, 475 U.S. at 421. "Only if the 'totality of the circumstances
6  surrounding the interrogation' reveal both an uncoerced choice and the requisite level of
7  comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived." <u>Id.</u>,
8  (quoting <u>Fare v. Michael C.</u>, 442 U.S. 707, 725 (1979)); <u>see also</u> <u>North Carolina v. Butler</u>, 441 U.S.
9  369, 374-375 (1979).

10       Petitioner first argues he did not knowingly and intelligently waive his <u>Miranda</u> rights.  In line
11  with controlling federal law, the state court looked at the totality of the circumstances and determined
12  that the waiver was both knowing and intelligent.  The state court found that Petitioner did not appear
13  to be under the influence of any substance.  It noted that Petitioner stated he understood his rights
14  before waiving them, and determined that Petitioner did not appear to be suffering from any mental
15  impairment.  The court also noted that four officers testified that Petitioner had been arrested on four
16  prior occasions, and on each of those occasions, Petitioner stated he understood his rights.  The record
17  confirms that Petitioner's waiver was not coerced and that Petitioner entered a knowing and voluntary
18  waiver of his rights.  Petitioner fails to demonstrate that the state court rejection of his claim was
19  unreasonable.

20       Petitioner also argues that his statement was involuntary because it was coerced.  The Supreme
21  Court has made clear that a statement is involuntary when the suspect's "will was overborne in such a
22  way as to render his confession the product of coercion." <u>Arizona v. Fulminante</u>, 499 U.S. 279, 288
23  (1991). In determining whether a statement is voluntary, Supreme Court precedent requires
24  consideration of "the totality of all the surrounding circumstances—both the characteristics of the
25  accused and the details of the interrogation." <u>Dickerson v. United States</u>, 530 U.S. 428, 434 (2000)
26  (quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973)). These surrounding circumstances
27  include "not only the crucial element of police coercion, <u>Colorado v. Connelly</u>, 479 U.S. 157, 167
28  (1986)," but may also include "the length of the interrogation, its location, its continuity, the

1 defendant's maturity, education, physical condition, and mental health." <u>Withrow v. Williams</u>, 507
2 U.S. 680, 693 (1993).
3     Here, the state appellate court looked to the totality of circumstances when it examined
4 whether Petitioner's will was overborne. Therefore, its ruling was not contrary to Supreme Court
5 precedent establishing the proper test for voluntariness. In reviewing the totality of the circumstances,
6 the state court determined that the interrogation was not unduly coercive. The interrogation lasted less
7 than an hour, it was not conducted at an unusually late hour, and refreshments were provided.
8 Petitioner was not threatened or intimidated. Investigators advised him that only the truth would aid
9 him, but these advisements were not designed to elicit a false confession. They were directed toward
10 eliciting the truth and not coercive in any way. As to his mental state, although Petitioner's expert
11 testified that his will was overborne due to his mental deficiencies, several experts disagreed with that
12 conclusion, and the trial court determined that the other experts were credible. Petitioner provides no
13 reason to find this conclusion was unreasonable.
14     The Court does not find the state court's reasoning to be an unreasonable determination of the
15 facts. The state court reasonably concluded that the statement was not the product of coercion. It
16 cannot be said that no fair-minded jurist would have agreed with the state court's determination. The
17 state court rejection was not contrary to or an unreasonable application of Supreme Court precedent.

18 **RECOMMENDATION**

19     Accordingly, the Court HEREBY RECOMMENDS that this action be DENIED WITH
20 PREJUDICE.
21     This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill, United
22 States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of
23 the Local Rules of Practice for the United States District Court, Eastern District of California. Within
24 thirty (30) days after service of the Findings and Recommendation, any party may file written
25 objections with the court and serve a copy on all parties. Such a document should be captioned
26 "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be
27 served and filed within fourteen (14) days after service of the objections. The Court will then review
28 the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that

failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **October 29, 2013**     /s/ Gary S. Austin
UNITED STATES MAGISTRATE JUDGE